# Illinois Official Reports

## Appellate Court

---

### *Thomas v. Khoury*, 2020 IL App (1st) 191052

---

| | |
|---|---|
| Appellate Court Caption | MONIQUE THOMAS, Individually and as Special Administrator of the Estate of Baby Doe; and CHRISTOPHER MITCHELL, Individually and as Special Administrator of the Estate of Baby Doe, Plaintiffs-Appellees, v. EDGARD KHOURY, M.D.; ROBERT KAGAN, M.D.; and ALEXIAN BROTHERS MEDICAL CENTER, Defendants, (Edgard Khoury, M.D., and Robert Kagan, M.D., Defendants-Appellants). |
| District & No. | First District, First Division<br>No. 1-19-1052 |
| Filed | March 31, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 18-L-1059; the Hon. John H. Ehrlich, Judge, presiding. |
| Judgment | Certified question answered; cause remanded. |
| Counsel on Appeal | Karen Kies DeGrand and Laura Coffey Ieremia, of Donohue Brown Mathewson & Smyth LLC, Mary Kay Scott and Austin C. Monroe, of Brenner, Monroe, Scott & Anderson, Ltd., and Michael Tarpey and Richard DeJong, of Hall Prangle & Schoonveld, LLC, all of Chicago, for appellants.<br><br>Edward K. Grassé, of Grassé Legal, LLC, of Schaumburg, for appellees. |

Panel                JUSTICE HYMAN delivered the judgment of the court, with opinion. Presiding Justice Griffin and Justice Walker concurred in the judgment and opinion.

**OPINION**

¶ 1    Monique Thomas and Christopher Mitchell seek damages, alleging Dr. Edgard Khoury and Dr. Robert Kagan caused the wrongful death of their fetus from injury suffered during elective surgery on Thomas. Pregnancy testing before the surgery alerted the doctors that Thomas was "potentially pregnant." After an inconclusive ultrasound, defendants proceeded with the surgery. A short time later, the pregnancy was confirmed. Because drugs and procedures had exposed the fetus to health risks that resulted in a nonviable fetus, Mitchell and Thomas had to decide whether to terminate the pregnancy. They decided on an abortion. Now, Thomas and Mitchell seek damages alleging the surgery injured the fetus leading to the wrongful death.

¶ 2    In denying defendants' motion to dismiss pursuant to section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2018)), the trial court found a substantial ground for difference of opinion as to the scope and application of the second and third paragraphs of section 2.2 of the Wrongful Death Act (740 ILCS 180/2.2 (West 2018)), and certified this question: "Whether section 2.2 of the Wrongful Death Act, 740 ILCS 180/2.2, bars a cause of action against a defendant physician or medical institution for fetal death if the defendant knew or had a medical reason to know of the pregnancy and the alleged malpractice resulted in a non-viable fetus that died as a result of a lawful abortion with requisite consent."

¶ 3    Basically, the question posed asks us to interpret the second paragraph in section 2.2, which bars a cause of action when a legal abortion with proper consent caused fetal death, and the third paragraph, which authorizes a cause of action, regardless of how the fetus died, based on the alleged misconduct of a physician or a medical institution who knew, or had a medical reason to know, of the pregnancy. *Id.*

¶ 4    We hold that the wrongful death action may proceed. Although the cause of the death, in a literal sense, was the abortion (second paragraph), the decision to abort or not arose out of defendants' alleged medical misconduct (third paragraph) when they knew and, "under the applicable standard of good medical care, had *** medical reason to know of the pregnancy." *Id.* The second and third paragraphs appear in section 2.2 as independent paragraphs, and under the facts here, the second paragraph does not nullify (or provide an impediment for bringing) the cause of action.

¶ 5                                    Background

¶ 6    On March 18, 2016, Alexian Brothers Medical Center admitted Thomas for "elective" surgery. Standard presurgical testing of urine and blood samples showed an elevated human chorionic gonadotropin (hCG), a potential indication of pregnancy. An ultrasound did not definitively show an intrauterine pregnancy, although it could have been consistent with a pregnancy of less than four weeks. The doctors told Thomas that she was not pregnant. Dr. Kagan performed the surgery with Dr. Khoury administering general anesthesia. (Plaintiffs voluntarily dismissed Alexian Brothers Medical Center as a defendant.)

¶ 7 After surgery, Thomas came to the emergency room at Advocate Lutheran General Hospital for treatment of an infection and received both analgesics for pain and antibiotics for the infection. Her pregnancy was then confirmed. The effects of anesthesia and other medications given before and during the surgery, and related to the infection, can bring about malformations in a fetus. Given a choice, Thomas terminated the pregnancy and had an abortion.

¶ 8 In count I of their "first amended complaint," Thomas alleged defendants deviated from the standard of care owed to her as a patient and directly caused harm to her and the fetus, resulting in the termination of her pregnancy. Specifically, as part of the standard presurgical testing procedures on the morning of the surgery, a urine pregnancy screening and a blood test for hCG were performed. Both tests "returned with positive results, indicating that Ms. Thomas was potentially pregnant." After the "returned positive results," an ultrasound did not definitively show an intrauterine pregnancy "but was consistent with a pregnancy of less than four weeks gestation." Thomas alleged defendants misled her by telling her " 'not to worry' and that she was not pregnant" and their negligence harmed the fetus.

¶ 9 Count II alleged the wrongful death of the fetus because of injury resulting from the breach of the standard of care owed to "Baby Doe as a medical patient." In count III, Mitchell alleged negligence that caused the death of Baby Doe by performing a surgery on Thomas and providing later treatment that they knew or should have known would cause injury or death to the fetus. Mitchell sought a judgment against defendants for his mental and emotional damages, "including but not limited to grief, sorrow, loss of affection, loss of society, loss of companionship, and mental shock and suffering."

¶ 10 The parties' dispute involves the second and third paragraphs of section 2.2 of the Wrongful Death Act:

"There shall be no cause of action against a physician or a medical institution for the wrongful death of a fetus caused by an abortion where the abortion was permitted by law and the requisite consent was lawfully given. Provided, however, that a cause of action is not prohibited where the fetus is live-born but subsequently dies.

There shall be no cause of action against a physician or a medical institution for the wrongful death of a fetus based on the alleged misconduct of the physician or medical institution where the defendant did not know and, under the applicable standard of good medical care, had no medical reason to know of the pregnancy of the mother of the fetus." *Id.*

¶ 11 The trial court found the statute does not address whether a cause of action for fetal death is barred where the defendant knew and had medical reason to know of the pregnancy and the defendant's alleged misconduct serves as the basis for causing a lawful abortion conducted with requisite consent. The trial court certified whether the statute contained a "seeming" internal inconsistency that bars this lawsuit.

¶ 12 Analysis

¶ 13 A permissive interlocutory appeal under Illinois Supreme Court Rule 308 (eff. July 1, 2017) creates an exception to the general rule that a party can appeal only from final judgments. *McMichael v. Michael Reese Health Plan Foundation*, 259 Ill. App. 3d 113, 116 (1994). A court of review avoids issues outside of the certified question and considers only the question

certified. *Applebaum v. Rush University Medical Center*, 376 Ill. App. 3d 993, 995 (2007). Our review is *de novo. Miller v. American Infertility Group of Illinois, S.C.*, 386 Ill. App. 3d 141, 144 (2008) (citing *Bajalo v. Northwestern University*, 369 Ill. App. 3d 576, 580 (2006)).

¶ 14     The fundamental rule of statutory construction involves ascertaining and giving effect to the legislature's intent. *Orlak v. Loyola University Health System*, 228 Ill. 2d 1, 8 (2007). The intent of clear and unambiguous statutory language should be drawn from the language's plain and ordinary meaning. *Id.* We do not append or substitute statutory provisions or "read into a statute exceptions, limitations, or conditions which depart from its plain meaning." *Light v. Proctor Community Hospital*, 182 Ill. App. 3d 563, 566 (1989) (citing *Belfield v. Coop*, 8 Ill. 2d 293, 307 (1956)). Rather, we evaluate the statute as a whole. See *Orlak*, 228 Ill. 2d at 8 ("In determining the plain meaning of a statute's terms, we consider the statute in its entirety, keeping in mind the subject it addresses, and the apparent intent of the legislature in enacting the statute.").

¶ 15     The trial court called the differences between the second and third paragraphs a "conundrum." Does the third paragraph authorize plaintiffs' cause of action because, regardless of how the fetus died, defendants' alleged misconduct serves as the basis for the wrongful death when defendants knew and should have known that Thomas was pregnant before her surgery? Or does the second paragraph bar the cause of action because fetal death resulted from a legal abortion with proper consent? The merits of the claims have no relevance to our determination.

¶ 16     Statutes in derogation of the common law, such as the Wrongful Death Act, cannot extend to situations beyond the legislature's intent. See *Murphy-Hylton v. Lieberman Management Services, Inc.*, 2015 IL App (1st) 142804, ¶ 27 ("The [Snow and Ice Removal Act (745 ILCS 75/1 *et seq.* (West 2010))] was passed in derogation of the common law. [Citation.] [A] court cannot construe a statute in derogation of the common law beyond what the words of the statute expresses [*sic*] or beyond what is necessarily implied from what is expressed. [Citation.] Any legislative intent to abrogate the common law must be clearly and plainly expressed, and we will not presume from ambiguous language an intent to abrogate the common law." (Internal quotation marks omitted.)).

¶ 17     The language of the second paragraph bars a cause of action against a physician or medical institution for the wrongful death of a fetus "caused by" a legal and consensual abortion. 740 ILCS 180/2.2 (West 2018). Coming after the second paragraph's incorporation of "caused by," the language of the third paragraph bars a cause of action where the defendants did not know and "under the applicable standard of good medical care, had no medical reason to know" of the patient's pregnancy. *Id.* These paragraphs stand independent of one another, each a separate limitation on causes of action against physicians and medical institutions.

¶ 18     We find the third paragraph does not bar a claim for wrongful death based on negligent medical care under the facts alleged in the first amended complaint. The Wrongful Death Act allows for a wrongful death action where a plaintiff can establish an actionable injury to the fetus without regard to an abortion being the ultimate cause of death. See *Seef v. Sutkus*, 205 Ill. App. 3d 312 (1990) (cause of action for negligent infliction of emotional distress recognized for wrongful death of fetus caused by failure to monitor condition during pregnancy and timely perform caesarean); *Riley v. Koneru*, 228 Ill. App. 3d 883 (1992) (parents of stillborn fetus may recover damages for medical negligence during pregnancy); see also *Smith v. Mercy Hospital & Medical Center*, 203 Ill. App. 3d 465, 474 (1990) (giving "deference to

- 4 -

the will of the legislature in providing parents with redress for the wrongful death of their unborn children as expressed in section 2.2 of the Wrongful Death Act, for where existing law imposes a duty, violations of which are compensable if they cause death even an instant after birth, nothing in ordinary notions of justice suggests that a violation should be nonactionable simply because death was caused in the womb").

¶ 19    The doctors argue *Light* is "closely analogous." See *Light*, 182 Ill. App. 3d 563. The *Light* court considered only the second paragraph of section 2.2, holding that a woman who voluntarily terminates her pregnancy through abortion could not maintain an action under the Wrongful Death Act on behalf of a fetus for defendants' alleged negligence. *Id.* at 565-66. Thomas and Mitchell distinguish *Light* on its facts. The alleged negligence of the hospital and the radiologist involved failing to determine a pregnancy before a thyroid scan. Thomas and Mitchell counter that the doctors' argument here concentrates on the death of the fetus (second paragraph), as in *Light*, but the appropriate emphasis should be on the negligent medical care, that is, the injury to the fetus (third paragraph) that resulted in the wrongful death.

¶ 20    A wrongful death action derives from the injury to the decedent and turns on the same wrongful act of defendant, whether prosecuted by the injured party during his or her lifetime or by a representative of his or her estate. *Williams v. Manchester*, 228 Ill. 2d 404, 426 (2008). The representative's right of action depends on the existence, in the decedent at the time of death, of a right of action to recover for the injury; "the statutory requirement of an injury to decedent confers the right of action in the first place." *Id.* at 422, 426.

¶ 21    In *Williams*, the plaintiff was 10½ weeks pregnant when she was seriously injured in a car accident. *Id.* at 407. Medical complications from her injuries brought about voluntary termination of her pregnancy. She then sued the other driver for the wrongful death of the fetus. *Id.* at 408-12. The supreme court affirmed the trial court's grant of summary judgment for the driver, noting that the Wrongful Death Act requires an actionable injury to the fetus with recoverable damages that could have been maintained "had death not intervened." (Internal quotation marks omitted.) *Id.* at 423. The record in *Williams* disclosed that the fetus was not injured in the collision. Rather, the plaintiff in her brief admitted that the injuries " 'occurred in the hospital following the crash.' " *Id.* at 424.

¶ 22    The supreme court found the emergency room treatment increased the risk of future harm to the fetus and was not a present injury for which the fetus could have brought an action for damages. *Id.* at 424-26. Indeed, the *Williams* plaintiff did not present evidence of damages. *Id.* at 426. Thomas and Mitchell argue that the procedural posture here differs. A motion to dismiss under section 2-619(a)(9) of the Code of Civil Procedure allows for the involuntary dismissal of a cause of action on the ground "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2018). Our interpretation of the statute gives Thomas the opportunity to plead and attempt to prove medical malpractice that injured the fetus (third paragraph) without regard to the death ultimately having been through an abortion (second paragraph). To find otherwise would enable physicians and medical institutions to deflect allegations of medical malpractice whenever an abortion follows alleged medical misconduct that injures a fetus and they knew and, under the applicable standard of good medical care, had medical reason to know of the pregnancy.

¶ 23    *Miller*, 386 Ill. App. 3d 141, relied on by the doctors, is inapposite on its facts and has no bearing on a possible internal inconsistency in section 2.2 of the Wrongful Death Act. There,

the plaintiffs sought to construe the Wrongful Death Act and the Illinois Abortion Law of 1975 (720 ILCS 510/1 *et seq.* (West 2006)) *in pari materia*, an approach the *Miller* court rejected because the two statutes address different subjects and were enacted for different purposes. *Miller*, 386 Ill. App. 3d at 151. "[I]t is clear that the legislature's intent in enacting section 2.2 of the Wrongful Death Act was to extend the cause of action to pregnancies in the mother's body regardless of whether the fetus was viable or nonviable." *Id.* at 150-51.

¶ 24    Accordingly, we answer *no* to the certified question that asked whether section 2.2 of the Wrongful Death Act bars a cause of action or recovery under the act "against a defendant physician or medical institution for fetal death if the defendant knew or had a medical reason to know of the pregnancy and the alleged malpractice resulted in a non-viable fetus that died as a result of a lawful abortion with requisite consent."

¶ 25    Certified question answered; cause remanded.